[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage.
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is dissolved for that reason.
II. The Conclusions of the Court Concerning Disputed Property Values.
A. The Maui Condominium.
This one bed room condominium in Papakea, Maui, Hawaii was purchased by the parties in 1986 for investment purposes. Mortgage payments and other expenses on the property have consistently exceeded the rents obtained. Plaintiff in his financial affidavit has valued the property at $165,000 while defendant in hers valued it at $140,000.
The court finds the value of their real estate to be $152,500.
B. The Family Home at No. 243 Dunk Rock Road, Guilford, CT.
After purchasing acreage at this location in 1979 the parties contracted for the construction of an impressive modified contemporary home on the site. Plaintiff in his financial affidavit has valued the property at $315,000 and defendant in her financial affidavit has valued it at $268,900. There was no expert testimony relating to the value of their home. CT Page 705
After weighing the testimony of the parties concerning their family home and reviewing several photographs of it, the court establishes the value of their property at $300,000.
C. Pine Point Camp, Upper Saranac Lake, New York.
This property includes a large attractive summer home located on Upper Saranac Lake in New York State and was formerly owned by the plaintiff's parents. Plaintiff has valued the property at $330,000 and defendant at $320,000. There was no expert testimony in this regard. Evidence revealed a verbal offer of $340,000 for the property in the recent past which did not develop further and another offer of $320,000 with similar results.
The court finds the value of this property to be $325,000.
D. Sunset Camp, Upper Saranac Lake, New York.
This beautiful vacation home was formerly the summer residence of plaintiff's parents.
While the parties were originally in dispute concerning its value, during the course of the trial the parties stipulated and the court concludes that its value is $412,500.
III. The values of the properties in dispute having been established, a list of the assets of each of the parties is set forth below to facilitate the final distribution by the court.
Plaintiff (husband)
1/2 interest in family residences at #243 Dunk Hill Rd., Guilford, CT.
Total Value $300,000
 1st mortgage 106,464 2nd mortgage 98,760 — 205,224 _______ 205,224 _______ Total Equity 94,776
1/2 interest $ 47,388
 1/2 interest in condominium in Papakea, Maui, Hawaii. Total Value 152,500 CT Page 706 Less mortgage — 68,712 _______ Total Equity 83,788 1/2 interest 41,894
 1/2 interest in Pine Point Camp, Upper Saranac Lake, New York.
 Total Value 325,000 mortgage balance 0 _______ Total Equity 325,000 1/2 interest 162,500
 1/2 interest in Sunset Camp, Upper Saranac Lake, New York.
 Total Value 412,500 1/2 interest 206,250
1989 Camaro — no equity — —
 Ski Boat — Total Value 11,750 Dovas Inflatable " " 800 Ranger 22 " " 2,750 _______ 15,300 1/2 interest in all 7,650 Other recreational boats and vehicles — — Bank Account 2,600 Life Insurance (C.S.V.) 480
 Point Lanier, Atlanta, GA. limited partnership — 2 units 1/2 interest 25,000
 Household furniture in his possession and at Upper Saranac Lake New York _______ $493,762
Defendant (Wife)
 1/2 interest in equity at #243 Dunk Rock Rd., Guilford, CT $ 47,388
 1/2 interest in equity at Papakea, Maui, Hawaii 41,894
1/2 interest in Pine Point Camp, Upper CT Page 707 Saranac Lake, New York 162,500
 1/2 interest in Sunset Camp, Upper Saranac Lake, New York 206,250
 1990 Pontiac Grand Am — equity 2,058 Household furniture in her possession — —
 Stock 787 Life insurance (C.S.V.) 117
ATT 401(1) 63,364
ATT pension 18,941
1/2 interest in 3 boats 7,650
 1/2 interest in Point Lanier, GA limited partnership — 2 units 25,000
 Jewelry including grandmother's ring — — _______ 575,949
Total Marital Estate of the Parties $1,069,711
IV. The examination and weighing of the evidence in this matter as it relates to Sec. 46b-81c C.G.S.
A. Concerning all of the marital assets of the parties excepting the Upper Saranac Lake properties:
The plaintiff is forty seven years of age and the defendant forty four. They were married on August 30, 1969, twenty two years ago. There were no children issue of the marriage. The parties separated after Christmas, 1988 and this action was instituted shortly thereafter.
The plaintiff spent his early years in Rochester, N.Y. where his father was a well regarded urologist. He attended Ohio Wesleyan University from which he was graduated in 1968. Defendant graduated from Dennison College, also in Ohio, in 1969. Plaintiff's sister was defendant's roommate at college and the parties met while defendant was vacationing at plaintiff's parent's summer home on Upper Saranac Lake, N.Y. They were married shortly after defendant's graduation and moved to Portsmouth, R.I. where plaintiff was serving in the U.S. Navy. Until plaintiff was discharged in 1972, defendant worked in a nearby bank as a computer operator. Thereafter, the parties returned to the Rochester area where plaintiff became a partner CT Page 708 in a business venture involving the operation of a country tavern and restaurant. This effort was not successful and in 1975 plaintiff began work as a salesman in the field of decorative and protective packaging. During this period (1973-1978) defendant was employed in computer related activities for Lincoln First Bank where she was eventually named vice president in charge of checking. The parties moved to Connecticut in 1975, finally settling in 1979 in the family home in Guilford where defendant resided at the time of trial. During this time plaintiff had continued his work as a salesman for various employers and was earning $26,000 per year. Defendant began her employment with Cheeseborough-Pond at this time, earning $30,000. For the next six years things went along reasonably well for the parties. They enjoyed skiing, sailing, tennis, golf and scuba diving together. Looking back from the witness chair on this idyllic period in their lives defendant stated "A lot of people were envious of us. Eric was my best friend — we were inseparable. We were always a team. Eric was competent, capable and talented. I felt I was the luckiest woman alive. I had confidence he could handle any situation. He was always there to support me." Plaintiff's description of this period in their lives was that "We both worked, I traveled more than Dianne. I worked out of our home. There was to a certain degree a role reversal. I could rearrange my schedule more than she could — my schedule was more flexible."
As so often happens, this pleasant cloudless existence ended in late 1985 when plaintiff confided to defendant his belief that he was an alcoholic. Plaintiff entered Stonington Institute, a treatment center for alcoholism, for a month's confinement in December, 1985, followed by other monthly treatments in the spring and autumn of 1988. Another week's stay at Stonington at the end of 1988 was followed by his last confinement there — a week at the end of January, 1990. Plaintiff testified that his sobriety day was February 23, 1990 and that he had abstained from alcohol since that date. In plaintiff's words "My whole life has changed since then, It hasn't been better but it has been different." At the present time he is an active member of alcoholic's anonymous, participates in a volunteer speaking program and in many other ways befriends those with a similar problem.
During this period, plaintiff's annual income continued to fall behind that of defendant. From 1986 through 1990 plaintiff's total income was $171,000 while defendant earned $380,000 during the same period. Defendant's spectacular increase in income at this time was due in part to a change of employment to ATT where she was involved in sales and received substantial commissions. CT Page 709
The marriage, on shaky grounds because of plaintiff's problem, was unable to withstand the revelation of defendant's infidelity. In October, 1988, plaintiff returned home unexpectedly from a stay at Stonington to find another man's clothes and suitcase in his closet. Shortly thereafter, defendant's friend returned from a search for ice for cocktails, and a not unexpected name calling scene ensued. Plaintiff returned to Stonington and in early January, 1984 commenced this action. A subsequent effort by the parties to reconcile failed.
Additional observations concerning fault.
The testimony and conclusions of the parties relating to the causes for the breakdown of their marriage are summarized as follows:
Plaintiff:
"Around 1985 I'd drink at lunch, dinner and after dinner everyday. Dianne drank with me but not as much. Weekends were party time! When I started drinking again after my first visit to Stonington, Dianne said `who is kidding who'"?
"After I discovered Dianne had been unfaithful, I lost 25 pounds. When she visited me thereafter at Stonington she said she felt like the girl with the scarlet letter. Looking back, I remembered Dianne coming home from company parties or golf tournaments with grass on her sweater. She told me she had passed out and slept on a green. I later learned she was at a lot of the outings with her boyfriend. During the Christmas season in 1988, when we visited Dianne's parents in Michigan, I had been sober for two months. I became mad when I discovered her calling her boyfriend, left for home, and began drinking again. This was one of the worst periods of my life — living a lie."
Defendant:
"Things were great until 1985 when Eric told me he was an alcoholic. He had multiple relapses. I'd held him try to quit — we'd go on walks together. I think his dad's death caused the problem — he always wanted to measure up to his dad. After he died, Eric didn't have to hide it anymore. Booze took away his competence, his happy attitude. It affected his energy, his drive."
Defendant described the intervals between plaintiff's various stays at Stonington as "the best of times, the worst of times." Pleasant vacations would be followed by periods of drinking. On September 2, 1988, defendant's birthday, plaintiff CT Page 710 embarrassed family friends who had been invited to their summer home by saying "hello" and then retiring to his bed. The next day he spent drunk in their living room while the others went sailing. She stated her feelings at this point as follows: "Booze had taken my husband. He was crushing me emotionally."
Concerning her infidelity, defendant commented as follows: "In September, 1988 I did something real wrong which I regret — I started a relationship with Jim. I guess I was weak at the time. Jim, a happily married man, was an assistant vice president of a company with whom my employer did business. He was a supportive person who was helping me through an emotional period. I invited Jim to visit my parent's condominium in Florida in 1989. At that time I thought our marriage was over. This affair went on for a year."
In another vein, defendant testified that on various occasions in 1988 plaintiff had "smashed" a picture of her, had thrown a mug of coffee against the cellar door, had ruined a bed spread, and had ripped a door off its hinges and thrown it downstairs.
Lastly, plaintiff admitted having had a sexual relationship with another woman which began subsequent to the commencement of this action.
Income:
Plaintiff is presently employed as a sales manager for Linvure Company, Inc. He has a gross weekly income of $865 and a net of $637 after the usual deductions.
Defendant testified that commencing November 1, 1991 she would have a new position at ATT, that of product marketing manager. Her annual salary would be $59,200 together with estimated profit sharing of $3,335 for a gross estimated annual income of $62,535 or $1,138 per week. After deductions for FICA and federal and state income taxes her net weekly income is computed to be $730.
Other factors:
The parties both appear to be in reasonably good health. Discounting plaintiff's attorney's fees and defendant's debt to plaintiff's mother, the parties have substantially similar liabilities and needs. On the evidence, it is concluded that defendant's opportunity for the future acquisition of capital assets and income exceeds that of plaintiff. The contributions of the parties in the acquisition, preservation, or appreciation in value of their estimated estates are, overall and on balance, CT Page 711 about the same.
Conclusion:
After having considered all of the factors recited in Sec. 46b-81c C.G.S. and after having given special consideration to such predominating factors as the length of the marriage, the amount and sources of income of the parties and their skills and employability, the opportunities of each for the future acquisition of capital assets and income, as well as the causes for the dissolution, this court concludes that the marital estate of the parties, excluding the Upper Saranac Lake property, shall be divided as follows:
 Plaintiff 50% Defendant 50%
The court notes from Article III that the value of said property is $332,211 (Total estate of $1,069,711 — value of Upper Saranac property — $737,500).
 Plaintiff's share $166,105 Defendant's share $166,106
B. Concerning the Upper properties.
1. Sunset Camp.
Sunset Camp is one of several summer homes on Upper Saranac Lake, N.Y. acquired by the plaintiff's parents — about forty years ago. Plaintiff's father, a well regarded doctor in Rochester, N.Y., who specialized in urology, had been attracted to the area while vacationing there with one of his patients. The parents over the years purchased many parcels with the view that their six children and later on their grandchildren would be able to enjoy this beautiful area with them. By way of interesting background, Sunset Camp was originally part of the "Bucknell Estate", named for the family that had founded Bucknell University. Sunset Camp is an exceedingly attractive waterfront summer home with brown cedar shingles and green trim, containing about 14 rooms, 4 fireplaces and a wrap around front porch. Plaintiff's parent's lived there for about ten years after Dr. Thompson retired, and since his death in 1985, plaintiff's mother has continued to spend summers there. While there, plaintiff's parents lived in a suite on the first floor, and it was at Sunset that they frequently entertained their friends.
In 1971 plaintiff's parents, in accordance with their previous plan, began conveying various camps to their children, CT Page 712 including a transfer of Sunset to plaintiff. Ruth Thompson, plaintiff's mother, bright and alert at 74, testified in this regard as follows: "Our plan was to divide all the lake property among our six children. Some of them were married but we just conveyed to our children. There were no strings attached to some parcels, but with the main house, Sunset, it was different. We intended to use it when we retired. It was understood that we were to have life use. In 1977 it became our legal residence after my husband retired, and in 1984 we stayed there all winter. Since 1988 I've used it in the spring, early summer and fall. My plans for the future are the same. Despite this detailed testimony by plaintiff's mother, defendant later testified that her present status at Sunset was "as a guest". This was a harsh indictment indeed of a mother-in-law by one who only two years previously had been the eager recipient of a portion of her most generous bounty.
On September 4, 1974, plaintiff conveyed a one-half interest in Sunset to defendant. Three months later, at a time when plaintiff was experiencing serious financial difficulties resulting from the failure of his restaurant venture, the parties reconveyed Sunset to plaintiff's mother. On July 2, 1980, when the parties had moved to Connecticut with their financial problems resolved, plaintiff's parents transferred Sunset to both plaintiff and defendant. There have been no further transfers of title to Sunset.
Pine Point Camp.
This attractive lakefront property, located some distance from Sunset, was in earlier times the caretaker's home for the Bucknell estate. It was originally given to two of plaintiff's sisters at the time he had acquired Sunset and in 1983 was retransferred by them to their parents. The description by plaintiff's mother of the history of the tract thereafter is most helpful. Ruth Thompson testified that "Pine Point was left to me in 1985 when my husband died. I was up there all alone and wanted to keep it in the family. Eric had got the family house (Sunset) which everybody considered home. I felt that if Eric and Dianne had it, it would generate money for them and keep it in the family." Many discussions followed, and on September 9, 1988 Ruth Thompson executed a deed of the property to plaintiff and defendant. For tax purposes, a mortgage of Pine Point by the parties to her was executed, but the required periodic payments were forgiven as they became due. On December 28, 1988, after Ruth Thompson had received a letter from defendant and at a time when the parties were estranged, Ruth Thompson recorded the deed and mortgage to Pine Point.
Contributions of the Parties to Sunset and Pine Point Camps. CT Page 713
While there is abundant evidence that both parties worked long and hard to improve their lake property, the testimony to this effect came for the most part from defendant. Her testimony in this regard is summarized as follows:
"We had the shingles on Sunset stained. We supplied new furniture, a TV, a VCR, wall lamps, scatter rugs. We put up new drapes, painted walls, totally refurbished a bathroom, put in new sinks and fixtures, new lighting outdoors, put crushed stone in the driveway, repaired the entrance gate. On Pine Point we stained, painted, replaced storm windows and screens, built a dock, purchased dock furniture. We bought new beds, mattresses, linens, carpets, wall hangings. We dredged ponds on the land and lined the ponds with stone."
Defendant testified that their home in Guilford, CT. was 300 miles distant from Upper Saranac Lake, N.Y. and that the driving distance was 5-1/2 hours. The parties made 10 trips to the lake in 1985, 30 trips in 1986 and similar amounts in following years. Weekends there would be spent working on their properties. During summers, whenever plaintiff was unemployed, he would remain alone at the lake during the week — working on the property.
Most recently the lake properties have been rented during the summer months, largely due to the efforts of defendant. Defendant estimated that the parties have expended a net of $100,000 for improvements and operating expenses on the lake properties during the past five years.
Conclusion:
By way of understatement, the disposition of this portion of the marital estate presents an interesting problem. Its solution might have been aided by evidence concerning the value of both Sunset and Pine Point at the time they were acquired by the parties, but such assistance was not forthcoming during the trial. In the matter of Jackson v. Jackson, 17 Conn. App. 431
(1989), a somewhat similar factual situation existed. There the defendant husband had during the course of the marriage inherited the family home from his parents. In the subsequent dissolution action the trial court awarded plaintiff wife one-half the appreciation in value on that property from the date of its acquisition by defendant to the date of dissolution.
On appeal it was held inter alia that in making the distribution the trial court had properly applied the statutory criteria of Sec. 46b-81c C.G.S. and that inherited property was CT Page 714 properly considered a part of the marital estate.
Without question the task of the court would have been simplified had it been able to insert the absent "value on acquisition" into the formula thoughtfully developed by the trial court in Jackson. Plaintiff contends in argument that the failure of defendant to supply the court with that information is a "fatal flaw" which leaves her without remedy and without any share in this portion of the marital estate. In the view of this court, "fatal flaw" is too cursory a diagnosis of defendant's legal ills, looking away from the last provision, almost an afterthought, in Sec. 46b-81c G.G.S. i.e., "the contribution of each of the parties in the acquisitions, preservation or appreciation in value (emphasis added) of their respective estates. Of special importance here also is the additional holding in Jackson, (p. 434) with reference to this statute that "the court is accorded wide latitude in varying the weight placed on each item under the peculiar circumstances of each case."
After weighing all the evidence relating to the lake property as it pertains to this particular portion of Sec. 46b-81c C.G.S., it is concluded that both lake parcels were acquired by the parties as gifts from plaintiff's parents because he was their son, and that defendant made no contribution to the acquisition. On the other hand, on the evidence, it is found that both parties contributed equally to the preservation or appreciation in value of this property.
After considering all of the evidence and conclusions recited in Article IV, A and after also considering the additional findings in Article IV, B immediately above, it is found that the share of each of the parties in the lake properties is as follows:
 Plaintiff 75% Defendant 25%
 Value of Sunset Camp $412,500 Value of Pine Point Camp $325,000 -------- $737,500
 Plaintiff's share — $553,125 — 75% Defendant's share — $184,375 — 25%
V. The allocation of the marital estate to the parties in accordance with the findings in Article IV AB.
Plaintiff (husband) — ($166,105 + $553,125 = $719,230) CT Page 715
Whole interest in Sunset Camp $412,500 Upper Saranac Lake, N.Y.
Whole interest in Pine Point Camp 325,000 Upper Saranac Lake, New York
Ski boat, Doval Inflatable 15,300 Ranger 22
Other recreational boats vehicles ---
Bank Account 2,600
Life insurance (C.S.V.) 480
1 Unit — Point Lanier, Atlanta, GA 25,000 Limited partnership
Household furniture where he resides and at Upper Saranac Lake, N.Y. --- ------- $780,880 — Amount due plaintiff — 719,230 -------- — Amount due defendant — $ 61,650
Defendant (wife) — ($166,106 + $184,375 = $350,481)
Entire equity in #243 Dunk Rock Road, Guilford, CT 94,776
Entire equity in condominium at Papakea, Maui, Hawaii 83,788
1990 Pontiac Grand AM — equity 2,058
Household furniture in her possession ---
Stock 787
Life insurance (C.S.V.) 117
ATT 401(1) 63,364
ATT pension 18,941
1 unit — Point Lanier, Atlanta, GA 25,000 limited partnership
Jewelry, including grandmother's ring ---
Amount due from plaintiff 61,650 -------- $350,481 CT Page 716
VI. Supplemental Orders Relating to Article V.
A. Plaintiff shall convey to defendant all his interest in premises located at #243 Dunk Rock Rd., Guilford, CT and in the condominium in Papakea, Maui, Hawaii. Defendant in turn will hold plaintiff harmless concerning the existing mortgages and other encumbrances on said premises.
B. Defendant shall convey to plaintiff all her interest on both Sunset Camp and Pine Point Camp, Upper Saranac Lake, New York. Plaintiff in turn will hold defendant harmless concerning any encumbrances on said premises and in particular concerning any note and mortgage executed by the parties in favor of Ruth Thompson.
C. The debt in the amount of $61,650 due defendant by plaintiff shall be secured by a promissory note and mortgage on premises known as Pine Point Camp, N.Y. Said note shall bear interest at the rate of 6% per annum, and shall be payable in full to defendant one year from date hereof.
D. Each party shall execute all documents necessary to carry out the orders of this court.
VII. Other Orders.
A. Alimony — Counsel fees.
In view of the previous orders made by this court, no award of alimony or counsel fees is made to either party.
B. Liabilities.
1. Plaintiff shall be solely responsible for the following debts listed on his financial affidavit — i.e.,
 Mrs. R.L. Thompson — $ 3,000 (on both Affidavits) Mastercard 3,950 Christian Thompson 2,000 Carl Lupont 725 Chip Frey 400 C. Michael Budlong 15,000
and shall hold defendant harmless concerning these debts.
2. Defendant shall be solely responsible for the following debts listed on her financial affidavit, i.e., CT Page 717
 Elizabeth Otte $ 3,000 Counsel fees 23,000
and shall hold plaintiff harmless concerning these debts.
3. The plaintiff and defendant shall be jointly responsible for the following debts, i.e.,
 ATT loan $18,860 est. Resorts Pac. 1,956 " IRS — capital gains tax on sale of part of Guilford property 11,996 "
JOHN D. BRENNAN STATE TRIAL REFEREE